JOHN MILTON PHIPPS *v.* WILLIAM M. WILSON

5-5617                                    472 S.W. 2d 929

Opinion delivered November 15, 1971

*David R. Monroe & James R. Howard,* for appellant.

*Martin, Dodds, Kidd, Hendricks & Ryan,* for appellee.

CARLETON HARRIS, Chief Justice. Donna Wilson Murrel was the beneficiary of an insurance policy on her husband Roger Murrel, who died on April 11, 1967, in Little Rock. Funds available from the policy, the insurer being Kansas City Life Insurance Company, amounted to $187,418.15. Three children were named as successor beneficiaries, but the policy reflects that after Murrel's death, Mrs. Murrel, the primary beneficiary, caused an endorsement to be placed on the policy providing that upon her death, if it should occur before all proceeds were paid, the remaining proceeds should be paid to William Wilson Murrel and Debra Margaret Murrel, both minors and children of Mr. and Mrs. Murrel.[1] On May 3, 1967, and July 27, 1967, Mrs. Murrel withdrew $10,000 (on each occasion) and on April 15, 1968, withdrew $100,000 from the Kansas City Life Insurance Company, the two minor children remaining successor beneficiaries for the balance of the deposit left with the company.[2] Mrs. Murrel purchased a home on Kavanaugh Boulevard in Little Rock, and on April 10, 1968, accompanied by Verne Barnes, State Agent for Kansas City Life Insurance Company, went to Stephens Investment Company to discuss the purchase of tax-free securities or bonds. She talked with Mr. Vernon Giss of that company, stating that she desired to invest $50,000 of the money she was withdrawing from Kansas City Life Insurance Company in the type of investment mentioned above. After conversation, Mrs. Murrel decided on tax-free bearer municipal bonds, and invoices were prepared confirming the sale. Mrs. Murrel asked that the bonds be held in custody for herself and her children. On April 30, 1968, she returned with her check for $50,000 and gave Mr. Giss the following letter:

---

[1] Two sons who were listed originally as successor beneficiaries were children of Mr. Murrel by a previous marriage and following the endorsement by their step-mother, after she became entitled to the proceeds of the policy, lost all interest.

[2] The funds remained with the company until August 14, 1969, at which time Dr. William M. Wilson of Salisaw, Oklahoma, Donna's father and grandfather of the two children, as guardian, was paid the balance from the company by two checks totaling $67,619.16, and these funds are not involved in this litigation.

"Stephens, Inc.
114 East Capitol
Little Rock, Arkansas

Gentlemen:

You are holding for me the following bonds:

26,000 Fort Smith Special School District 4½% Bonds, Due 3-1-86

25,000 Paragould 5¾% Industrial Development Revenue Bonds, Due 7-1-86.

It is my intention that each year I will make gifts to the following children:

William Wilson Murrel

Debra Margaret Murrel.

These gifts will be in the amount of $3,000.00 in principal amount, each year, beginning May 1, 1968.

Yours truly,
(s) Donna W. Murrel

Donna W. Murrel"

Mrs. Murrel was given a check on that date in the amount of $92.24, which was the difference between the cost of the bonds and $50,000. Thereafter, on July 2 ($359.40), and September 16 ($552.50), the company remitted interest checks, as orally directed, made out to Donna Murrel.

On December 24, 1968, Donna married John Milton Phipps, appellant herein. Joint checking accounts were opened in the name of Mr. and Mrs. Phipps, apparently with her money, in the Commercial National Bank and Worthen Bank & Trust Company of Little Rock. About $7,000 was placed in the Commercial National Bank, and it is not entirely clear what amount was placed

in the Worthern Bank & Trust Company.[3] On April 25, 1969, Mrs. Phipps closed the joint account at the Commercial National Bank, withdrawing $5,400.00 therefrom, and redeposited it in her individual savings account at Pulaski Federal Savings and Loan Association. About 3:00 a.m. on the following morning, Mrs. Phipps was found dead from a gunshot wound and the coroner found that Mrs. Phipps "apparently shot herself". Thereafter, appellant was appointed administrator of the estate of Donna Louise Phipps, and subsequently her father, Dr. Wilson, as guardian of the minor children, filed a motion asking that Phipps be removed as administrator because of a conflict of interest. Phipps removed considerable furniture and household goods from the home, gave to friends some of his wife's personal property, and never filed an inventory.[4] He withdrew as administrator and the administrator in succession, First National Bank of Little Rock, has been unable to make an itemized inventory of the assets, some being in storage and some at the homes of friends and relatives. An accounting was filed by appellant covering the period from May 6, 1969, to May 29, 1969, and Dr. Wilson, appellee herein, filed numerous exceptions to the accounting. On hearing, and after taking the testimony of witnesses, the court found in effect, that the bonds purchased with the $50,000 were a gift from Mrs. Phipps to her minor children, the mother making provisions that annual payments of $3,000 should be made to each of the children each year; that Phipps had no interest in such bonds, and they were not a part of her estate. The court did find however that these funds were subject to right of contribution for estate, gift, and income taxes and cost of administration, and, the overplus, if

---

[3]Interest checks from Stephens were also received on January 10, 1969, ($718.75), and March 7, 1969, ($552.50). These checks were endorsed by Donna W. Murrel per Donna W. Murrel Phipps and marked "For deposit only" with account number 4750-084-8 listed underneath.

[4]After the marriage between Phipps and Mrs. Murrel, she deeded her home to his attorney, and the attorney, in turn, deeded it back to the two as an estate by the entirety. Of course, upon her death, Phipps became absolute owner of the home, and that is not in question here. Subsequent to her death, appellant sold this property.

any, should be paid to William M. Wilson, guardian of the persons and estates of the minor children.

The court further found that Phipps failed to file a true and accurate inventory and accounting, and a number of items were listed in the order (judgment) that had not been accounted for by appellant. The following findings were then made:

"The Court, also, finds, that because of such wrongful acts of misfeasance by the administrator, he has waived any right of curtesy or administrator's fees in the estate of Donna Louise Phipps; that approval of such inventory and final report should be withheld pending delivery of all such items of personal property, in the hands of John Milton Phipps or which are in the possession of others, to the First National Bank, administrator in succession; that failure to do so forthwith will render him in contempt of the orders of this Court."

From the order so entered, appellant brings this appeal. Three points are asserted for reversal and we will discuss them in the order listed.

"I

The Court erred in holding that John Milton Phipps, widower of the decedent, had waived his curtesy interest in the decedent's estate.

II

The Court erred in holding that the municipal bonds described in the order appealed from were not a part of the estate, but were a gift to the decedent's minor children.

III

The Court erred in holding that John Milton Phipps, as Administrator of the Estate of Donna Louise Phipps, wrongfully misappropriated those items of personal property described in the order appealed from."

I

We think the court erred in holding that Phipps had waived his curtesy rights in the decedent's estate. Our statute, Ark. Stat. Ann. § 61-230 provides that one who shall murder his or her spouse shall not be endowed in the real or personal estate of the decedent spouse, but there are no other statutory exceptions to the absolute right of dower or curtesy. As pointed out in 13 ALR 3d 452:

"Statutes establishing a right of dower or curtesy sometimes provide for forfeiture of the right under some circumstances where the surviving spouse has been guilty of abandonment, desertion, or nonsupport. It has generally been recognized in the cases dealing with the application of such forfeiture statutes, that something more than a mere physical separation of the parties is necessary in order to work a forefeiture."

Forfeiture of the right of dower or curtesy is statutorily provided for in some jurisdictions in cases of abandonment, adultery, or nonsupport (in addition to murder of the spouse). On page 455, it is stated:

"In a number of cases involving the construction of a statutory provision granting the right of a surviving spouse to take a distributive share of the deceased spouse's estate, or to elect such a share as against the spouse's will, it has been held that in the absence of a statute declaring a forfeiture of such right for abandonment, desertion, or nonsupport, the court could not engraft such an exception into the statute granting the primary right, and therefore the surviving partner would not be barred from sharing in the estate of the deceased partner."

A number of cases are cited to this effect. Contrariwise, in the case of *Doherty* v. *Traxler,* 66 So. 2d 274, the Supreme Court of Florida held that where a husband married the wife, Gertrude, and only 24 hours after the marriage, which was never consummated by cohabitation, left for parts unknown, and went through a biga-

mous marriage with another woman, living with her for 20 years, the husband was estopped and barred from asserting any right in Gertrude's estate. The court said:

"This proceeding is in the nature of an equitable proceeding. The appellant comes into Court with unclean hands. He shows by his own testimony that he has openly, brazenly and flagrantly violated the laws of God and man and every principle of right, justice, decency, public policy and sound morals. For twenty years he lived happily (by his own admission) with his bigamous wife and is still living happily with her. He shows no shame and offers no excuse or apology. He now seeks the aid of a Court of conscience, in an equitable proceeding, to assist him in obtaining the fruits of a commercial venture which culminated in an uncompleted and unconsummated ceremony and which he abandoned for the joys and pleasures of a life of his own choosing. No Court should aid or assist him in such a nefarious scheme."

See also *Nedd* v. *Starry*, 143 So. 2d 522.

Of course, in the case before us, there is no evidence that appellant had anything to do with the death of his wife, nor did he abandon her. To the contrary, the two were living together at the time of her death, and we find that the court committed error in holding that Phipps forfeited his right of curtesy in his wife's estate.

II

We also find that error was committed by the trial court in holding that Mrs. Phipps had made the gift of approximately $50,000 worth of bonds to her two children. In *Bennett* v. *Miles, Administrator*, 212 Ark. 273, 205 S. W. 2d 451, this court set out the elements necessary to constitute a valid gift. We said:

"Gifts *inter vivos,* as well as *causa mortis,* to be effective as such, must be established by clear and convincing evidence and the elements essential to their validity must be proven as a whole by such evidence. In

*Stifft* v. *W. B. Worthen Co.,* 176 Ark. 585, 3 S. W. 2d 316, we said: 'The elements necessary to constitute a valid gift *inter vivos* were stated by this court in *Lowe* v. *Hart,* 93 Ark. 548, 125 S. W. 1030, to the effect that the donor must be of sound mind, must actually deliver property to the donee, must intend to pass the title immediately, and the donee must accept the gift.'

In the more recent case of *Baugh* v. *Howze,* 211 Ark. 222, 199 S. W. 2d 940, we said: 'To constitute a valid gift *inter vivos,* certain essential elements must be present, these include actual delivery of the subject-matter of the gift to the donee or to some one as agent or trustee for the donee, with a clear intent to make an immediate present and final gift beyond recall, and at the same time unconditionally releasing all future dominion and control by the donor over the property so delivered.' "

With these rules in mind, let us examine the facts in the instant case. Even a cursory examination of the letter written by Mrs. Phipps (Murrel) to Stephens, Inc., reflects that she did not make any gift on April 30, 1968, for she said "It is my intention that *each year I will make gifts* [Our Emphasis] to the following children". So, it is manifest that nothing was given on April 30. It is also clear that she did not release all future dominion and control over the property, as she drew four payments of interest herself. While it might be said, that as mother of the children, she was the proper person to receive any funds due to them, it appears that the interest checks were deposited in her joint account with her husband at the Worthen Bank. Certainly, there is no evidence that there was a separate account for the children, and if she made a gift of the bonds to her children, she would not have been entitled to receive the interest checks individually. Furthermore, as stated by Mr. Giss, there was nothing to prevent Mrs. Phipps from changing her mind at any time subsequent to April 30, and giving new directions for disposition of the bonds or proceeds—or for that matter, selling the bonds, and doing whatever she desired with the money. Of course, we recognize that Mr. Giss is not a lawyer and his opinion that Mrs. Phipps could make further disposition of the

bonds or proceeds would not control the law in the matter, but the evidence is important because it shows that Mrs. Phipps knew that she still had control of the bonds. Whether she had the right to sell the bonds was discussed with Mr. Giss, who testified:

"I guess it was after she was married, she called me one day about selling the bonds, wanted to know whether she could sell these bonds. She did not come in. She just called me on the phone and indicated that she thought she might want to put the money in some other place. And so I told her, of course, the bonds were marketable. They could be sold if she wished to. If she decided to sell them she should call us and we'd give her a market price on them. She did not call back, did not instruct us to sell them."

Appellee, of course, takes the view that Stephens, Inc. as agent for Mrs. Phipps, was empowered to make the annual gift of $3,000 to each child. In addition to the other reasons already stated as to why no valid gift of the $50,000 worth of bonds was perfected, there is yet another flaw in appellee's argument.

In *Baugh* v. *Howze supra,* we quoted with approval 28 C. J. § 31, p. 640, as follows:

"While a delivery may be made to a third party in order that the latter may deliver the subject of the gift to the donee as agent of the donor, the gift is not complete until there is an actual delivery to the donee, and until the gift is completed by delivery the donor can revoke the agent's authority and resume possession of the gift. As the authority of an agent is revoked by the death of his principal, the death of the donor before the actual delivery of the property to the donee terminates the authority of the agent to make such delivery, and the gift, therefore, fails for want of delivery. So, also, the delivery of property to an agent to be delivered to an intended donee after the donor's death is not sufficient to sustain a gift *inter vivos,* and such a disposition is void as being in contravention of the statute of wills."

Mrs. Phipps died on April 26, 1969, which brings up the only phase of this transaction which might be said to create any possible right in the children. This relates to the fact that it could be argued that $3,000 of the principal amount was due to be given the children on May 1, 1968. But we cannot agree that such argument would be persuasive. In the first place, the sentence is most ambiguous. Does the language mean $3,000 per child, or $3,000 for the two of them? Mr. Giss interpreted the letter to mean $3,000 per child, apparently primarily because Mrs. Phipps had been interested in obtaining tax-free bonds, and Giss said that, under the law, $3,000 could be given to each child without any gift tax being due. However, it also appears that perhaps the understanding for the transfer was that the date should be one year later, i. e., May 1, 1969, for Giss had not separated any of the bonds or placed them in an account in the names of the children. It will be recalled that a gift *inter vivos* requires clear and convincing evidence and the sentence directing that gifts be made is certainly not clear, either in the amount, or, judging by the actions of Mrs. Phipps and Giss, when such payments were to commence. If such payments were to commence on May 1, 1968, it would seem that Mr. Giss would have made a book transfer soon after that date; likewise Mrs. Phipps would not have deposited the interest checks in her joint account in Worthen Bank. All of the funds are still being held intact, but under the record before us, we are unable to say that a gift was made of any amount of the bonds.

While only mentioned, and not really argued, it is suggested that a trust was created by Mrs. Phipps, with the children as beneficiaries and Stephens Investment Company as trustee. We cannot agree. In the first place, there is nothing in the evidence that reflects an intention to create a trust. In *Krickerberg* v. *Hoff*, 201 Ark. 63, 143 S. W. 2d 560, some of the rules relating to the creation of a trust are set out. Quoting from 26 R. C. L. 1183, § 20, the court said:

"There can be no trust if there is no intention to create one, and therefore the first and great rule of con-

struction, to which all other rules must yield, is that the intention of the grantor shall prevail, provided it be consistent with the rules of law. . . ."

Mr. Giss was emphatic in stating that Stephens, Inc. never acted as trustee for anybody, and was not acting in that capacity on this occasion.

This litigation was tried entirely on the theory that a gift was made to the children and, still quoting from the authority mentioned, the court further said:

"It is a well established rule that where an intended gift is incomplete or imperfect because of lack of delivery or other cause, and there is insufficient evidence to establish a trust, the courts will not, on account of such imperfection, convert the imperfect gift into a declaration of trust in order to effect the intention of the donor. . . ."

Accordingly, this theory must fail also.

### III

Very little is argued by the appellant on this point, it simply being stated that he did not intentionally withhold the reporting to the probate court of any items of personalty; that some of the items not reported were mistakenly thought to be his property, and "some were not reported through human error". Without detailing the testimony, there was considerable evidence to show that many items that belonged to the estate had been appropriated to the use of appellant and a number of items which the court found belonged to the estate, are set out in the order. On some other items, which we consider of importance, no order was made. For instance, it was established that Mr. Murrel's parents had given him two diamond rings, one to give to Donna, and one to wear himself. Mrs. Murrel, Roger Murrel's mother, described the lady's ring as a solitaire with stones on either side and set in platinum. The man's ring was a solitaire. The rings had been insured in 1961 and had been appraised for that purpose by Charles F. Stifft & Co.

of Little Rock, and Mrs. Murrel had a copy of the appraisal. The court sustained an objection by appellant to this offer of evidence on the basis that it was hearsay. Mrs. Murrel then stated, as her own testimony, that the lady's ring was valued at $1,500 and the ring given to her son at $1,200. It is clear that she obtained this figure from the appraisal which she had. It is not clear whether the court admitted this testimony, but certainly, it should not be difficult, since Charles F. Stifft & Co. is located here in the city of Little Rock, to present evidence about the appraisal. Mr. Phipps agreed that Mrs. Phipps had these two diamond rings, but he said he didn't miss them until he looked in the lockbox after the funeral. Of course, the inference in appellee's brief is that Phipps took the rings. On the other hand, appellant testified that Dr. Wilson was in the house for several days after the death of his daughter, Mrs. Phipps. The court, in commenting on this phase of the case, said:

"There is undisputed testimony that there were some diamond rings of some substantial value belonging to the deceased which no one seems to be able to account for, which the Court is not willing to understand too quickly."

We think the court should hear further evidence and pass upon the question of the rings.

As far as the court's finding that Phipps failed to file a true and accurate inventory and accounting, and the assets listed which the court held had been intentionally withheld from such inventory, we are unable to say that these findings are against the preponderance of the evidence, and such findings are affirmed.

Summarizing, the judgment insofar as it relates to appellant's forfeiture of curtesy rights, is reversed. Of course, if it is determined that Phipps took personal property, that belonged to the estate, such property would be properly charged against his curtesy interest. The judgment insofar as it holds that the $50,000[5] in

---

[5]It is not exactly clear from the record the specific amount that is presently held in bonds.

bonds was a gift to the minor children, is reversed, and the court is directed to enter a judgment finding that these bonds belong to the estate. The finding of the court that the particular items mentioned in the judgment belong to the estate, and directing Phipps, under penalty of being held in contempt, to deliver such items to the administrator in succession, is affirmed. It is noted that the judgment recites that approval of the final accounting of Phipps is deferred until the administrator abides by the orders of that court.

It is ordered that the cause be remanded to the Pulaski County Probate Court (Third Division) for further orders not inconsistent with this opinion.