Joy Sue GARIBALDI *v.* Richard L. DIETZ, Administrator

CA 87-425                                        752 S.W.2d 771

Court of Appeals of Arkansas
En Banc
Opinion delivered July 6, 1988

*Brian Wolfman*, Legal Services of Arkansas, for appellant.

*Claudia Driver*, Asst. Gen. Counsel, Arkansas Department of Human Services, for appellee.

MELVIN MAYFIELD, Judge. This is an appeal from a probate court order granting appellee's petition for termination of parental rights and appointment of a guardian with authority to consent, without notice to or consent of the natural parents, to the adoption of two minor children, Timothy Garibaldi, born February 11, 1976, and Casey Garibaldi, born December 3, 1984.

Timothy Garibaldi has been under the care and custody of the Arkansas Department of Human Services since September 9, 1985. On April 22, 1986, appellee Richard Dietz, Administrator of Adoption Services, Arkansas Department of Human Services, filed a petition seeking appointment as guardian with power to consent to adoption with respect to Timothy. Casey Garibaldi has been under the department's care and custody since March 4, 1986, and in January 1987, the department amended its petition to include her.

A hearing was held May 15, 1987, at which the appellant, Joy Sue Garibaldi, appeared and opposed the granting of appellee's petition. After hearing the evidence, the court granted the petition. The court found that the appellant suffers from a long-standing and uncontrollable mental or emotional illness; that the return of custody of the children to the appellant would present a substantial risk of serious harm to them as a result of appellant's illness; that the appellee had attempted for a period of six months to provide remedial support services designed to reunite the children with their mother, but these services were refused; that the testimony, except for James Moneypenny, a psychologist, is not indicative of any ability in appellant to care for her children; that appellant has functioned somewhat adequately in the structured setting of a nursing home, but this setting would not be appropriate for the raising of children and, from the evidence presented, appellant will never be able to care for her children outside such a structured setting; that the children's best interests will be served by termination of appellant's parental rights; and that appellant, by her own testimony, even at the time of trial, still holds some of her delusions.

On appeal to this court, appellant first argues the trial court erred in finding her an unfit parent because the appellee failed to provide appropriate remedial services and because appellant's mental illness is under control. Appellant says the evidence indicates that her mental illness is controlled and has been controlled since shortly after she received proper medical treatment.

Ark. Code Ann. § 9-9-304 (1987) lists the conditions which permit a court to appoint a guardian with power to consent to the legal adoption of the child or children. Under that statute, before entering a guardianship order, the court shall find from the evidence that:

> (3) Both parents are, or the surviving parent or the mother of an illegitimate child is, unfit to have the child for any of the following reasons:
>
> . . . .
>
> (F)(i) Placing the child in the custody of the parent would raise a substantial risk of serious harm to the child;
>
> (ii) However, before grounds may be established under this subdivision, the court must be satisfied that the parents have received for a period of up to six (6) months in the discretion of the court, from the Arkansas Department of Human Services, remedial support services designed to reunite the child and the parents and that such services have failed to substantially reduce the risk of harm to the child.
>
> (iii) In determining the risk the court may consider, but shall not be deemed to be limited to, one (1) or more of the following:
>
> (a) Longstanding and uncontrollable mental or emotional illness or mental deficiency of the parent;

In a proceeding to appoint a guardian with power to consent to adoption, the evidence justifying the appointment must be clear and convincing; and while this court reviews probate proceedings de novo, the findings of the trial court will not be disturbed unless clearly erroneous, giving due regard to the opportunity and superior position of the trial judge to determine the credibility of

the witnesses. *Burdette* v. *Dietz,* 18 Ark. App. 107, 711 S.W.2d 178 (1986).

In the instant case, there was evidence that appellant had been hospitalized three times between May 22, 1985, and July 3, 1986. A doctor testified that appellant's diagnosis after her third admission was "bipolar disorder manic, what we call mood congruent." He said appellant was "psychotic with a bipolar manic"; a "congruent psychotic" with "judgment markedly impaired by psychosis." After release from her third hospitalization, appellant resided in nursing homes until the date of the hearing in this matter. At that time, she had no place to live and was taking medication for her illness.

Dr. Matthews, who had examined appellant on her second and third hospital admissions, testified by deposition that appellant was not capable of parenting at the time of her third discharge. He said she was still very sick when she was discharged from the hospital and they felt she had to be in a structured environment and that is why they referred her to a nursing home. He testified that appellant's disorder can be controlled by medication, that she needs long-term medication, and that persons with her type of disorder are notorious for not staying on their medication. He said that, if appellant has been in a structured environment for the past eleven months with no manic episodes, it is not significant as to what will happen in the future. He stated the key to her being able to face life on the outside is whether she would stay on her medication.

Dr. Hickman, who interviewed appellant on April 21, 1987, testified by deposition that appellant suffers from mental illnesses of psychotic proportions and that her illnesses are not curable. He testified that appellant's chances to stay on medication are guarded at best. It was his impression that she was not interested in continuing her medication. He said appellant could not make it on the streets and that she does not recognize she is sick. Dr. Hickman testified that appellant did not talk about her children during the interview other than being concerned about getting them back, and that the more accurate measure of her parenting ability would be how she was as a parent prior to her illness. He said appellant would not be as good a parent now because psychosis does not improve parenting skills, and that appellant's

type of illness can be explosive even while on medication.

James Huett, appellant's oldest son, testified that his mother quit her job in Morrilton in 1982. At that point, he said, his mother started talking to herself and put "no trespassing" signs in the yard. After Casey was born, they moved to North Little Rock. His mother let his brother, Tim, stay home from school and she heard they were going to call Social Services, so the family left. He said the family took a bus to Fort Smith and hitchhiked from there to Oklahoma, then to Kansas City, and then all the way back to Morrilton. This was in April of 1985. James said that he had been the one primarily responsible for taking care of the kids because his mother couldn't do it. He testified that he had been scared of his mother; that her moods would change; and that she behaved erratically. He said she told him that he was paid to kill her and she'd kill him and have his daddy get the coffin and put James in it for his eighteenth birthday. James also testified that his mother had told him and the other children that she had a relationship with Mac Davis, the entertainer, and had plans to marry him. James's testimony detailed her psychotic episodes and delusions, and he testified that he thought the children should be in foster care.

As to appellant's contention that the appellee had failed to provide appropriate remedial services, the record shows that appellant was offered counseling and refused. Peggy Hendricks testified that she was a service worker for Children and Family Services and became involved in the Garibaldi case in 1985 when she had offered appellant counseling services and appellant refused. Linda Woodruff, who was the case worker from June 1985 through January 1987, testified that several services were offered to the appellant and that appellant refused the home-maker services, mental health counseling, and all of the educational information items. Ms. Woodruff also testified the only service ever accepted was transportation to go shopping on two occasions.

From the foregoing evidence, we cannot say the trial court's finding appellant an unfit parent was clearly erroneous.

Appellant next argues the trial court erred in admitting and considering the prior testimony of Timothy Garibaldi because it was hearsay. The court admitted testimony of Timothy taken at a

mandatory administrative review hearing held by a foster care magistrate for the purpose of deciding whether services provided to the children while in foster care were adequate, whether and to what degree parental visitation was proper, and similar matters. Appellant says Rule 804 of the Arkansas Rules of Evidence provides for the admission of some former testimony if the witness is "unavailable" within the meaning of the rule, but that Timothy was not unavailable under any of the criteria of Rule 804.

When the state sought to introduce Timothy's testimony, the following exchange took place:

> MS. DRIVER: At this point I would like to introduce into evidence Tim Garibaldi's testimony, if you have no objection. You wouldn't agree?

> MR. WOLFMAN: I don't mind us going over it, but I don't think it is admissible.

This was the extent of appellant's objection. Appellant's counsel failed to state the specific grounds of her objection to this testimony and we do not think they were apparent. Error cannot be predicated upon a ruling admitting evidence unless a timely objection is made stating the specific ground of the objection if the ground is not clear from the context. *Walt Bennett Ford, Inc.* v. *Brown,* 283 Ark. 1, 670 S.W.2d 441 (1984); A.R.E. 103(a)(1). Moreover, at best, this evidence was cumulative because substantially the same evidence was admitted without objection through the testimony of Janis Engelkes, a psychological examiner who had examined Timothy. Without objection, she testified to what Tim had told her. We find no prejudicial error in the admission of Tim's testimony.

Appellant finally argues the trial court erred in finding that termination of parental rights was in the best interest of the children, and especially, by failing to distinguish between the two children. Appellant contends the notion of best interest cannot be taken literally as it would in a custody dispute between parents; but rather, due regard must be given to the paramount rights of the natural parent. Appellant argues that there is some testimony that the mother-child bond between Timothy and the appellant has been broken because of appellant's illness, but that Casey has suffered no conscious rejection.

In *Burdette* v. *Dietz,* 18 Ark. App. 107, 711 S.W.2d 178 (1986), this court stated:

> While we agree that the rights of natural parents are not to be passed over lightly, these rights must give way to the best interest of the child when the natural parents seriously fail to provide reasonable care for their minor children. Parental rights will not be enforced to the detriment or destruction of the health and well-being of the child.

18 Ark. App. at 109. In the instant case, the trial judge heard evidence that appellant had hitchhiked across several states with the children; that James Huett had been primarily responsible for taking care of the children; that he thought Casey and Tim should be in foster care; that Timothy had no desire to go back and live with appellant because of the way his life was when he lived with her; that appellant's illnesses were not curable; and that appellant could not make it on the streets. While there was some evidence that appellant had functioned somewhat adequately in the structured setting of a nursing home, the trial court found that raising children in a nursing home is not in their "best interest."

The judge in his ruling from the bench stated:

> I know how important my children are to me, and I am sure they're just as important to Mrs. Garibaldi. I am truly concerned. I do not believe Mrs. Garibaldi can look after the children. . . . It is very sad. It is unfortunate. And, it certainly is not an easy thing to do, is to deprive a parent from the right to be with their children. But, it is not right to the children to place them with the parent simply because they're a parent, if it is not for the benefit of the children. . . . I am sure it would be beneficial to Miss Garibaldi to have the children with her, and probably be therapeutic. I don't think it would be therapeutic and beneficial to the children, and I don't think the past history of this family relationship is indicative that it will ever be a happy and congenial home for these children.

We cannot say that the trial court erred in finding that termination of parental rights was in the best interests of the children.

Appellant has filed a motion to strike certain portions of the

appellee's supplemental abstract and brief. We were aware of appellant's objections and have relied only on matters in the record in reaching our decision. Therefore, for practical purposes, the appellant's motion has been granted.

The trial court's decision is affirmed.

JENNINGS, J., dissents.

JOHN E. JENNINGS, Judge, dissenting. When the State seeks to terminate parental rights the probate court must first determine whether the parent is fit or unfit. *Dietz v. Bevell,* 276 Ark. 500, 637 S.W.2d 555 (1982). Only if the parent is found unfit does the court then address the issue of the best interest of the child. *Bevell, supra.* A finding of unfitness must be supported by specific findings of fact. *Bush v. Dietz,* 284 Ark. 191, 680 S.W.2d 704 (1984). The facts supporting a finding of unfitness must be shown by clear and convincing evidence. *Bush, supra; A.B. v. Arkansas Social Services,* 273 Ark. 261, 620 S.W.2d 271 (1981).

In this case the probate court's conclusion that Mrs. Garibaldi was unfit was solely and exclusively based upon its specific finding that Mrs. Garibaldi was suffering from a long-standing and uncontrollable mental illness. The probate judge then found that the children's best interests would be served by terminating Mrs. Garibaldi's parental rights and putting the children up for adoption.

I cannot say the probate judge was wrong in finding that it was in the best interests of the children that they be placed for adoption, and it is undisputed that Mrs. Garibaldi suffers from bipolar affective disorder.[1] It is also fair to characterize this disorder as "long-standing" because the evidence is that she has suffered from this disorder since 1982.

However, the real issue in this case is whether the chancellor's finding that her illness is "uncontrollable" is clearly erroneous under Ark. R. Civ. P. 52. If that finding was clearly wrong the

---

[1] This illness is what psychiatrists used to call manic-depressive psychosis. *Arkansas Blue Cross & Blue Shield, Inc. v. Doe,* 22 Ark. App. 89, 733 S.W.2d 429 (1987). Although the issue was not raised, it is questionable that bipolar-affective disorder is a "mental" illness. *See Doe,* above.

trial court's order cannot stand, as a matter of law. Certainly we must give due deference to the superior position of the trial judge to determine the credibility of witnesses. Despite such deference it is nevertheless our duty to reverse the probate court when its factual determination as to a critical issue is clearly wrong. In my view, the probate court was clearly wrong in finding Mrs. Garibaldi's illness to be "uncontrollable."

The testimony of various witnesses established that during the almost one-year period prior to the hearing her illness was completely controlled. From her final release from the state hospital in June, 1986, until the hearing in May, 1987, Mrs. Garibaldi voluntarily resided in various nursing homes. Brenda Smith the Social Service Director at the Fulton County Nursing Center testified that she had observed Mrs. Garibaldi almost daily over a period of two to three months. She testified that her general demeanor was pleasant and cooperative and that she never gave them any problem. She said Mrs. Garibaldi never lost control emotionally nor went into a psychotic state. She had never known Mrs. Garibaldi to refuse to take her medication. Lisa Gannaway was the Social Services Director at Riverview Manor Nursing Home in Morrilton. She testified that she had daily contact with Mrs. Garibaldi over a period of about three months. She too said Mrs. Garibaldi created no problems and exhibited no psychotic behavior or loss of emotional control. She too testified that, to her knowledge, Mrs. Garibaldi never refused to take her medication.

Barbara Wilder, the resident service director at the Conway Convalescense Center testified that Mrs. Garibaldi was there for approximately one month. She described her as an ideal patient and testified that Mrs. Garibaldi had no emotional or psychotic outbursts whatsoever. She also said that Mrs. Garibaldi realized the importance of taking her medication. Even Linda Woodruff the caseworker who apparently had the primary responsibility in Mrs. Garibaldi's case conceded that in her contact with Mrs. Garibaldi after her release from the State Hospital she observed no psychotic episodes and that Mrs. Garibaldi's attitude was "real pleasant."

Mrs. Garibaldi was examined by Dr. Carl Arnold, M.D., on January 8, 1987. He thought that there was an excellent

possibility that, if she would take her medication, Mrs. Garibaldi could return to her normal activities at any given time.

Dr. James R. Moneypenny, a psychologist, evaluated Mrs. Garibaldi on April 20, 1987. He conducted a clinical interview and gave Mrs. Garibaldi psychological tests, including the Minnesota Multiphasic Personality Inventory and the Millon Clinical Multiaxial Inventory. In the summary to his written report Moneypenny said:

> Joy Garibaldi presents herself as alert, well oriented and psychologically stable. Her intellectual functioning is average. While her mental status was positive for recent history of psychosis in a psychiatric hospitalization, she appears to have recovered and is currently functioning at a level considered close to her pre-morbid level. There is a relative absence of psychiatric symptoms and emotional distress as evidenced on the testing though she was experiencing feelings of over sensitivity and suspiciousness. Her course of treatment at the State Hospital may represent an overly serious picture of the chronicity and seriousness of her illness due to the fact that she had an allergic reaction to her medication. Records indicate her thinking and behavior rapidly improved when her medication was corrected. She currently continues to take her medication and her compliance is considered to be good.
>
> The findings indicate she is currently capable of resuming a routine lifestyle, including the custody and care of her children.

In his trial testimony Moneypenny said that no active psychosis was shown on any of the psychological tests and that Mrs. Garibaldi was even without symptoms of neurosis. He testified that he thought she could be an "O.K. parent." While he agreed that her staying on medication was a legitimate concern and that it was possible under certain conditions for her to have another psychotic episode if she were to quit taking her medicine, he thought that there was a good chance that she would keep taking her medication outside the nursing home.

We must not forget that this is not a custody case — Mrs. Garibaldi is not seeking custody. She seeks only to avoid the

irrevocable termination of the parent-child relationship. We should also be mindful that this relationship is one which is protected by both the state and federal constitutions. *Bush* v. *Dietz*, 284 Ark. 191, 680 S.W.2d 704 (1984).

I would reverse.