Val JAMISON and Sara Lynn Jamison *v.* The ESTATE OF
Robert Sims GOODLETT, Deceased

CA 96-361 938 S.W.2d 865

Court of Appeals of Arkansas
Division III
Opinion delivered February 19, 1997

*Pilkinton, Pilkinton & Yocom*, by: *Tony Yocom*, for appellants.

*Harrell & Lindsey, P.A.*, by: *Paul E. Lindsey*, for appellee.

WENDELL L. GRIFFEN, Judge. Val Jamison and his wife, Sara Lynn Jamison, appeal from a decree by the Hempstead County Chancery Court that granted judgment in favor of the estate of Robert Sims Goodlett, deceased, against them for $185,645.30, plus prejudgment interest of $29,418.43 for the period beginning December 21, 1992, until August 11, 1995, upon a finding that appellants failed to prove that Robert Sims Goodlett made an *inter vivos* gift to them of all his land and personal property when he gave Val Jamison a power of attorney dated September 4, 1987. The chancellor also decreed that appellants are to return a 315-acre farm and all other property that they hold that was previously owned by the decedent and which they obtained after Val Jamison transferred that property to Sara Lynn Jamison and himself by using the power of attorney. Appellants argue: (1) that the chancellor erred in granting a directed verdict in favor of the administrator of the estate of Robert Sims Goodlett and declaring the alleged gift to be invalid; (2) that the chancellor erred by holding that the statute of limitations had not run on the estate's claim

against Val Jamison for breach of fiduciary duty for refusing to deliver all of the decedent's money and property where the estate brought suit on the breach of fiduciary duty claim within three years of December 21, 1992, the date of the decedent's death; (3) that the chancellor erred in holding that appellants are required to return the undivided one-fourth interest of Reese Goodlett in the 315-acre farm; and (4) that the chancellor erred in awarding appellees $17,765.00 for attorney fees, and $2,940.25 for costs. We have conducted a *de novo* review of the record and hold that the chancellor's decision was not clearly erroneous. Therefore, we affirm the chancellor's decree on all points raised in the appeal.

## *Factual History*

Robert Sims Goodlett lived in Hempstead County, never married, and had no offspring. During his later years, he lived with one of his brothers, David Sloman Goodlett ("Sloman"), with whom he operated a 315-acre farm that the two brothers owned as tenants in common as well as a country store in Ozan, Hempstead County, Arkansas. Sloman Goodlett died February 2, 1987, survived by Robert Goodlett and another brother, Jordan Reese Goodlett ("Reese"), who lived in Hot Springs, Arkansas, with his wife, Marie. Reese Goodlett inherited a one-fourth undivided interest in the farm when Sloman died, leaving Robert Goodlett with an undivided three-fourths interest.

Robert Goodlett was a first cousin to Rafe Goodlett, the father of appellant Sara Lynn Goodlett Jamison, and Rafe Goodlett had a farm on land adjoining the farm owned by Robert. During Rafe Goodlett's lifetime, appellant Val Jamison would fix fences, cut bushes, and keep cattle on the Rafe Goodlett farm, and would visit Robert Goodlett. During the first few days of September 1987, Robert Goodlett became very ill. He arranged for Val Jamison to be contacted, and requested that Jamison take him to a local hospital for emergency treatment by his personal doctor. On the day after he was admitted to the hospital, Robert Goodlett informed Val Jamison that he needed to pay some pending bills and that he had a checking account at First National Bank of Hope. Val Jamison contacted a bank official (Martha Horn), who went with another bank employee (Alan Green) to visit Goodlett

in order to obtain his consent to add Val Jamison's signature to the checking account so that Jamison could pay Goodlett's bills. After Horn questioned Goodlett to confirm that he understood the effect of adding Jamison's signature to the account, Jamison signed the signature card and Goodlett initialed it.

According to Jamison, during the September 1987 hospitalization Goodlett became concerned about his health condition after his doctor indicated that he needed to undergo a surgical procedure and stated that he should place his affairs in order. Jamison testified that Goodlett stated that he wanted to give all of his money and property to Jamison and his wife, Sara Lynn. There were no other witnesses to the alleged conversation. On September 4, 1987, Jamison obtained a power of attorney from Goodlett that was prepared by Ed Alford, an attorney selected by Jamison. It does not appear from the record that Alford interviewed or otherwise conferred with Goodlett regarding preparation of the power of attorney. In fact, Goodlett had directed Jamison to consult another attorney concerning preparation of the power of attorney, but Jamison testified that the designated attorney (Jim Bob Steel) was unavailable so Jamison arranged for Alford to prepare the power of attorney instead.

Jamison began transferring Goodlett's property to himself and to his wife after he obtained the power of attorney. On September 8, 1987, Goodlett underwent an endoscopic procedure that left him too weak to permit the surgical procedure that his doctor had contemplated. On September 11, 1987, Jamison obtained a warranty deed from Reese and Marie Goodlett, and Robert Goodlett (by Val Jamison under the power of attorney), which conveyed the 315-acre farm to Sara Lynn Jamison. Val Jamison had first asked Alford (the attorney who prepared the power of attorney) to prepare the warranty deed for the 315 acres to himself. After Alford indicated that this conveyance was unsound, Jamison directed that the land be conveyed to Sara Lynn, his wife. The deed was recorded on September 29, 1987. Jamison also began closing or combining all of Goodlett's bank accounts, including three accounts at First National Bank of Hope, one account at Citizens National Bank of Hope, two accounts at Citizens National Bank of Nashville, two accounts at

First Federal Savings of Arkansas, and an account at First National Bank of Nashville. Jamison later moved Goodlett's personal property to his (Jamison's) house. These actions were taken using the authority vested by the power of attorney that Goodlett had given Jamison and, according to Jamison, were consistent with and pursuant to Goodlett's statement that he intended to give Jamison and his wife all of the money and property. Jamison maintained Goodlett's finances and personal property separate from his own, kept records of all transactions concerning Goodlett's property and financial transactions related to his money, and reported to Goodlett about the warranty deed that conveyed the farm to Sara Lynn Jamison as well as the actions to close or combine Goodlett's bank accounts.

Jamison testified at trial that Goodlett approved of the actions that were taken based on the power of attorney and did not express a desire to repudiate or change them. Jamison paid Goodlett's bills each month, transacted his farm business, and handled the filing of his annual tax returns. In February 1989, Jamison signed a crop-share lease, as attorney-in-fact for Goodlett, in favor of Leroy Morrow. Goodlett's tax returns from 1987 until 1990 reflect that profits from interest income, farm income, rents, and royalties were claimed as income on Goodlett's tax returns, but Jamison testified that the profits from these items were actually placed in a separate account in Jamison's name that he maintained for Goodlett's benefit. At some point in time Jamison sold a car and cattle trailer that belonged to Goodlett, and deposited the sale proceeds into that account. He later purchased Goodlett's GMC truck and deposited the $1,500 purchase price into the account that he maintained for Goodlett's benefit. On September 10, 1990, Jamison changed the beneficiary on a life insurance policy that Goodlett had purchased from Reese Goodlett to Sara Lynn Jamison following Reese Goodlett's death on July 23, 1990.

Robert Goodlett died intestate on December 21, 1992. As of that date, $185,645.30 remained from the money that he owned. His estate made demand upon Val Jamison and Sara Lynn Jamison for the return of all property and monies held by them as trustees for Robert Goodlett. Appellants refused to return the property and monies, contending that Goodlett had made a valid

*inter vivos* gift to them. The estate then filed suit for an accounting; imposition of a constructive trust covering all monies and property held by appellants based upon the fiduciary relationship between Robert Goodlett and Val Jamison; for a determination that any gift alleged by appellants was void; and for reasonable attorney's fees, costs, and interest. Appellants resisted the suit and contended that Goodlett made a valid *inter vivos* gift to them of the monies and property. Alternatively, appellants argued that the statute of limitations had run before the estate filed suit, and that the estate's claim was barred by the equitable doctrine of laches.

After receiving testimony from thirteen witnesses, and following the estate's motion for directed verdict, the chancellor granted the estate's motion and entered a decree finding that appellants had failed to prove the validity of a gift from Robert Goodlett "beyond a reasonable doubt." The chancellor also ruled that the appellants failed to prove by a preponderance of the evidence that a gift was made or intended by Robert Goodlett. The chancellor held that the power of attorney executed by Goodlett in favor of Val Jamison created a fiduciary relationship that Jamison breached when he failed to return Goodlett's monies and property to Goodlett's estate after his death, and that the three-year statute of limitations for the breach-of-fiduciary-duty claim did not begin to run until Goodlett died on December 21, 1992, and had not expired when the estate filed its lawsuit in 1994. Based upon those findings and conclusions, the chancellor entered the decree from which this appeal has been taken by appellants.

### The Inter Vivos Gift Argument

Appellants first contend that the chancellor applied the improper standard of proof in ruling on the estate's motion for directed verdict. In the decree, the chancellor addressed the burden of proof as follows:

> The Court finds and determines that the burden of proof required to prove the validity of a gift of this magnitude and made in this manner requires a standard of proof "beyond a reasonable doubt." The Court is noting this standard of proof in the event there is an appeal because the law is not clear as to the appropriate

standard of proof required to prove a gift made under these circumstances.

The Court finds that the Defendants have not only failed to prove beyond a reasonable doubt that a gift was made by the decedent, but that they have also failed to prove by a preponderance of the evidence that a gift was made or intended by the decedent.

■ Appellants rely upon *Mercantile Bank v. Phillips & Glasco*, 260 Ark. 129, 538 S.W.2d 277 (1976), for the proposition that a donee who has a fiduciary relationship with a donor must present clear and convincing evidence to overcome the presumption that a gift arising from that relationship is void. Appellee concedes that this is a correct statement of the law, citing *Birch, Adm. v. Coleman*, 15 Ark. App. 215, 691 S.W.2d 875 (1985), for the same proposition. Thus, the parties agree that the chancellor erred by ruling that appellants were obligated to prove that the decedent intended and effected a gift of his property and monies beyond a reasonable doubt.

■ However, the chancellor's misapprehension regarding the burden of proof does not preclude an appellate court from undertaking a *de novo* review of the case and entering judgment upon the proper standard of proof. *See Maroney v. City of Malvern*, 320 Ark. 671, 899 S.W.2d 476 (1995), where the Arkansas Supreme Court held that although a chancellor had based his decision upon an erroneous conclusion, the appellate court was not precluded from reviewing the case *de novo* and entering judgment as was proper. The relevant inquiry is not merely whether the chancellor erred concerning the burden of proof, but whether his judgment was proper when the proof is measured by the proper standard.

■ It is well settled that a directed verdict is only proper where the evidence, when viewed in the light most favorable to the nonmovant, is so insubstantial as to require a jury verdict for the movant to be set aside. *City of Little Rock v. Cameron*, 320 Ark. 444, 897 S.W.2d 562 (1995). On appeal from a chancery court order granting a directed verdict, the court on appeal must decide specifically whether the plaintiff made out a *prima facie* case of enti-

tlement to the relief requested. *Shaver v. Spann*, 35 Ark. App. 118, 813 S.W.2d 280 (1991). This requires that the evidence presented by the party against whom the directed verdict is sought must be given the highest probative value, taking into account all reasonable inferences therefrom. *Cameron* at 446.

█ Although the chancellor erred by holding appellants to the beyond-a-reasonable-doubt standard of proof regarding the validity of the alleged *inter vivos* gift from the decedent, our *de novo* review of the record leads us to conclude that the error was harmless because appellants failed to meet the clear-and-convincing-evidence standard of proof required to sustain an *inter vivos* gift. Arkansas law is clear that one seeking to sustain an *inter vivos* gift must prove by clear and convincing evidence that: (1) the donor was of sound mind; (2) an actual delivery of the property took place; (3) the donor clearly intended to make an immediate, present, and final gift; (4) the donor unconditionally released all future dominion and control over the property; and (5) the donee accepted the gift. *Howard v. Weathers*, 55 Ark. App. 121, 932 S.W.2d 349 (1996). In *Howard*, we held that these elements had not been established where the proof showed that a decedent received a monthly stipend from money that she inherited from a sister. *Id.* at 124. The decedent had instructed Weathers to "take care" of the money that she was to inherit, and to send her $100 monthly, and had told Weathers that he could keep the remainder of the money when she died. After the decedent's death, Weathers refused the request by the executrix of her estate to turn over the money, claiming that the decedent had made a gift of the money to him. We reversed the trial court's decision dismissing the estate's complaint, holding that the proof did not establish the elements necessary for a valid *inter vivos* gift because the decedent received the monthly stipend and retained authority to demand additional sums at her own pleasure, thus showing that she did not completely surrender dominion and control over the money by placing it with Weathers, and showing that she did not make an unconditional or irrevocable immediate and final gift of the money. *Id.*

We believe that the case before us involves a similar failure of proof. The chancellor held that appellants failed to present proof

sufficient to establish, either beyond a reasonable doubt or by a preponderance of the evidence, that Robert Goodlett made a valid *inter vivos* gift to appellants when he executed the September 4, 1987, power of attorney. Although the beyond-a-reasonable-doubt standard is inapplicable because it is higher than the clear and convincing evidence burden that properly applies to analysis of evidence concerning alleged *inter vivos* gifts, the proof in this case contains shortcomings similar to that presented in *Howard*.

■ Appellants failed to establish by clear and convincing evidence that an actual delivery of Robert Goodlett's money and property took place; that Goodlett clearly intended to make an immediate, present, and final gift; that Goodlett unconditionally released all future dominion and control over the money and property; and that they accepted the money and property as a gift. Despite Val Jamison's testimony that Robert Sims Goodlett intended to give all of his money and property to him and his wife when he executed the power of attorney, and that Goodlett never repudiated or objected to the transfer of his money and land into appellants' names through the use of the power of attorney, Jamison continued to account to Goodlett for the money and property. Jamison executed a crop-share lease in Goodlett's name on February 20, 1989, in favor of Leroy Morrow, despite having transferred title to the land on which the crop was raised to Sara Lynn Jamison. The lease payments were credited to Goodlett, not to Jamison, even though Sara Lynn Jamison was the titled owner of the land that had been leased. Tax returns for Goodlett were prepared at Val Jamison's direction, signed by him as attorney-in-fact for Goodlett, and reported interest earned on money attributed to him and held by appellants. Val Jamison maintained careful records of Goodlett's money that had been transferred from the various bank accounts into accounts held in appellants' names, and always kept Goodlett's money separate from appellants' money. Val Jamison admitted giving Goodlett periodic reports concerning the money and property, admitted that he paid Goodlett's bills using Goodlett's money, admitted that he did not use any of Goodlett's money for his own purposes during Goodlett's lifetime, and admitted that if Goodlett or his surviving brother (Reese Goodlett of Hot Springs) had expressed a desire to assume

control over the money and property he would have accommodated that desire.

It is especially noteworthy that when Val Jamison decided to purchase a truck, he *purchased* a GMC truck from Goodlett, paid $1,500 for it, and deposited the sale proceeds into an account that he maintained exclusively for Robert Goodlett despite his assertion that Goodlett had already given the truck to him by virtue of the power of attorney. These and other factors constitute clear and convincing proof that Goodlett did not unconditionally release all future dominion and control over his property, that appellants did not accept his property as a gift (otherwise they would not have purchased and paid for what they already owned, as in the pickup truck), that actual delivery of his property did not take place, and that Goodlett did not intend to make an immediate, present, and final gift of his property.

Arkansas law has long held that all five elements must be established by clear and convincing proof in order for an *inter vivos* gift to be sustained. *Irvin v. Jones*, 310 Ark. 114, 832 S.W.2d 827 (1992); *Wright v. Union Nat'l Bank*, 307 Ark. 301, 819 S.W.2d 698 (1991); *Phipps v. Wilson*, 251 Ark. 377, 472 S.W.2d 929 (1971); *Maloy v. Stuttgart Memorial Hosp.*, 42 Ark. App. 16, 852 S.W.2d 819 (1993). It is not enough that a purported donor intend to make a gift, or intend even that the donor take actions that may support the view that he intended for a purported donee to have his property. The law requires clear and convincing proof that the donor was of sound mind, *and* that actual delivery of the property took place, *and* that the donor clearly intended to make an immediate, present, and final gift, *and* that the donor unconditionally released all future dominion and control over the property, *and* that the donee accepted the gift. *Wright*, 307 Ark. at 304. Even if one accepts appellants' argument that Robert Sims Goodlett's manic depressive condition did not deprive him of the soundness of mind required for effecting an *inter vivos* gift, they clearly failed to produce clear and convincing proof on the other four elements. Therefore, the chancellor's decision that they failed to establish an *inter vivos* gift was not clearly erroneous, despite the fact that the chancellor applied an improper standard of proof.

■ Our decision sustaining the chancellor's holding should not be interpreted as a judgment about the good faith of appellants in believing that Robert Goodlett had given his property to them, nor should it be viewed as disregarding the scrupulous attention that Val Jamison clearly gave to Goodlett's care and to the upkeep of his affairs. Instead, our decision and the chancellor's holding simply mean that appellants failed to present clear and convincing evidence that the well-established legal requirements for establishing an *inter vivos* gift were satisfied. Those requirements exist because claims of *inter vivos* gifts, by their very nature, are often susceptible to fraud and imposition. *Howard*, 55 Ark. App. at 124; (citing Krickerberg v. Hoff, 201 Ark. 63, 143 S.W.2d 560 (1940)). In many instances these gifts are claimed, as here, based upon parol evidence from the purported donee after the purported donor has died. The exacting requisites and clear-and-convincing-proof standard serve sound public-policy purposes of preventing mistake and confusion, as well as fraud and imposition. The law sets the standard of proof and defines the elements of proof that must be established; it is up to property owners and the persons who claim to be donees to supply the required proof.

## The Statute of Limitations

Appellants also argue that the chancellor erred in holding that the statute of limitations had not run on appellee's claim against them for breach of fiduciary duty. Arkansas Code Annotated § 16-56-105 is the applicable statute of limitations for breach of fiduciary duty. *Smith v. Elder*, 312 Ark. 384, 849 S.W.2d 513 (1993). Appellants argue that the three-year limitations period prescribed by that statute began running no later than September 1987, when Val Jamison used the power of attorney to convey the 315-acre farm to Sara Lynn Jamison, as demonstrated by the warranty deed that was recorded on September 29, 1987. Because the administrator of Robert Goodlett's estate did not commence this lawsuit until 1994, appellants maintain that the breach of fiduciary duty claim is barred by limitations.

■ Appellants' limitations argument fails because there is no proof that Val Jamison acted to deprive Robert Goodlett of the rightful use and benefit of his money and property, even after he

conveyed the 315-acre farm to Sara Lynn Goodlett. As already mentioned, Val Jamison was scrupulous in maintaining records of all monies earned by Goodlett and from his possessions. There is no proof that Val Jamison appropriated any part of Goodlett's money or property for personal benefit during Goodlett's lifetime. Indeed, the evidence shows that Jamison used several thousand dollars of Goodlett's money to retire the debt on his (Jamison's) personal residence, but this action took place only after Goodlett's death. Goodlett died on December 21, 1992, and there is no allegation or proof that he or anyone acting for him was denied use of his property by Val Jamison before he died. Therefore, Jamison's refusal to turn over Goodlett's money and property obtained by way of the power of attorney to the administrator of Goodlett's estate was the first action that was adverse to Goodlett's estate for which a claim of breach of fiduciary duty could be asserted. The administrator of the estate filed this lawsuit in 1994, less than three years after Jamison refused to turn over Goodlett's property and money. Accordingly, we do not find the chancellor's rejection of appellants' statute-of-limitations defense to have been erroneous.

### The Reese Goodlett Interest in the Farm

We also find unpersuasive appellants' challenge to that part of the chancellor's decree that ordered them to return to appellee the undivided one-fourth interest in the farm that Reese and Marie Goodlett conveyed to Sara Lynn Jamison. Although appellants accurately assert that the decree did not specifically refer to the interest obtained from Reese Goodlett and that the prayer for relief did not specifically include a request for reconveyance of that interest, these arguments overlook the fact that appellee sued to have the deed set aside that conveyed the 315-acre farm in which Reese Goodlett held an undivided one-fourth interest and specifically sought to have the property revert to appellee. The complaint that appellee filed also sought an accounting of all money and property that appellants held for Robert Goodlett's benefit.

 Sara Lynn Jamison clearly held the deed to the farm by virtue of one transaction, namely the warranty deed dated September 11, 1987, from Robert Goodlett, by Val Jamison pursuant to the power of attorney, *and* from Reese and Marie Goodlett.

The deeded farm was part of the rest of Robert Goodlett's property covered by appellee's lawsuit that sought imposition of a constructive trust over all property that appellants obtained from Robert Goodlett and held for his benefit. These factors persuade us that the chancellor's ruling was not clearly erroneous insofar as it ordered appellants to return the one-fourth interest that they obtained from Reese Goodlett.

### Attorney's Fees and Costs

■■■ Appellants' challenge to the provisions of the chancellor's decree that awarded attorney's fees of $17,765.00, and costs of $2,940.25, is also unpersuasive. There is no indication that appellants objected to appellee's application for attorney's fees and costs before the chancellor. The failure to timely object to what one believes to be trial court error has long been viewed a waiver of the objection, and we have consistently held that parties may not raise on appeal objections that were not made and preserved below. *Estate of Tucker v. Tittertington*, 46 Ark. App. 322, 881 S.W.2d 226 (1994); *Garibaldi v. Dietz*, 25 Ark. App. 136, 752 S.W.2d 771 (1988).

Affirmed.

JENNINGS and BIRD, JJ., agree.